An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA14-1324

Filed: 15 September 2015

Forsyth County, Nos. 12 CRS 55869-71, 12 CRS 59535-37, 39

STATE OF NORTH CAROLINA

v.

MICHEAL ANTONY[1] PAIGE

Appeal by defendant from judgment entered 26 February 2014 by Judge Edwin G. Wilson in Forsyth County Superior Court. Heard in the Court of Appeals 5 May 2015.

> *Roy Cooper, Attorney General, by Marc X. Sneed, Assistant Attorney General, for the State.*

> *Staples Hughes, Appellate Defender, by Kathryn L. VandenBerg, Assistant Appellate Defender, for defendant-appellant.*

DAVIS, Judge.

Michael Anthony Paige ("Defendant") appeals from his convictions for (1) possession with intent to sell or deliver cocaine; (2) three counts of possession with intent to sell or deliver heroin; (3) possession of marijuana up to one half of an ounce;

---

[1] Both Defendant and the State spell Defendant's name "*Michael Anthony* Paige" in their briefs. However, Defendant's name is spelled "*Micheal Antony* Paige" in the trial court's judgment. Both spellings refer to the same person.

(4) possession of a firearm by a felon; (5) driving with a revoked license; (6) carrying a concealed gun; (7) maintaining a vehicle for the purpose of selling a controlled substance; (8) two counts of selling heroin; (9) two counts of delivering heroin; (10) trafficking in opium or heroin by possession; and (11) trafficking in opium or heroin by transportation. On appeal, he contends that the trial court erred in (1) denying his motion to suppress; and (2) admitting evidence inadmissible under Rule 404(b) of the North Carolina Rules of Evidence. After careful review, we reverse the trial court's denial of Defendant's motion to suppress, vacate the trial court's judgment in part, and remand for resentencing.

## Factual Background

The State presented evidence at trial tending to establish the following facts: From 9:00 p.m. on 14 June 2012 through the early morning hours of 15 June 2012, Detective Kimberly Williams ("Detective Williams"), a detective with the Winston-Salem Police Department's Special Investigations Unit, was performing surveillance of Combs Barber Shop ("the Shop"), an establishment located on Waughtown Street in Winston-Salem, North Carolina, after having received an anonymous telephone tip one to three months earlier that a man named Shae Collins ("Collins") — who had recently been released from prison — was selling drugs out of the Shop. Detective Williams was familiar with both Collins and the Shop as she had arrested Collins for

trafficking in cocaine while executing a search warrant at the Shop twelve years earlier in 2000.

Detective Williams observed the Shop from her Jeep Cherokee, which was parked across the street approximately 40-50 feet away. She noted that the Shop's "Open" sign was not illuminated but that Collins was inside. During the course of her surveillance, she saw several individuals go into the Shop and exit shortly thereafter without appearing to have received haircuts.

At 10:59 p.m., Detective Williams saw Defendant arrive in a silver Pontiac Vibe. She observed "[Defendant] got out of his car, and . . . walk[ ] into the hair salon, which [Collins] was in . . . at this time, not in the Combs Barber Shop. And they went inside and, you know, spoke or whatever they were doing. I couldn't see inside the business." Collins then came outside and began speaking with two men standing on the corner by the Shop. Shortly thereafter, Defendant exited the hair salon and joined the conversation. He then got back into his Pontiac Vibe and drove away from the Shop in the direction of the intersection of South Martin Luther King Road and Thomasville Road.

Detective Williams called Detective R.J. Santiago ("Detective Santiago"), who at the time was several blocks away from the Shop in an unmarked patrol vehicle, and ordered him to follow Defendant's vehicle. Detective Santiago then began

pursuing Defendant as he crossed the intersection of South Martin Luther King Road and Thomasville Road.

Just before Defendant arrived at the Old Lexington Road intersection, he took a sharp turn into the parking lot of a closed business, and Detective Santiago, believing that Defendant was engaging in a counter-surveillance tactic, continued to drive past the business. Detective Santiago reestablished pursuit shortly thereafter and observed Defendant approach the Highway 421/52 interchange and merge "onto the on-ramp to go onto 421 northbound and then g[et] back on the on-ramp to go to 52 southbound, and then g[et] back on the on[-]ramp to go to 421 southbound, and then g[et] back on the on[-]ramp to go to 52 northbound to continue to go up north."

Based on his belief that Defendant was once again engaging in counter-surveillance tactics, Detective Santiago radioed other officers in the area, including Detective Williams, and reported Defendant's actions. Upon hearing Detective Santiago's report, Detective Williams issued a general order over the radio that Defendant's car be stopped, and Corporal J.P. Timberlake ("Corporal Timberlake"), who was also in the vicinity, pulled over Defendant's vehicle on University Parkway.

Corporal Timberlake instructed Defendant to move his vehicle to a nearby parking lot for safety reasons. Corporal Timberlake then exited his patrol car, approached the driver's side of Defendant's vehicle, and asked Defendant for his

driver's license.  Defendant told Corporal Timberlake that the Pontiac Vibe belonged to his aunt.

As Corporal Timberlake proceeded to perform a computer check on Defendant's driver's license, other patrol officers arrived at the scene.  One of the officers — a K-9 officer who was not identified by name at trial — had his canine conduct an "exterior sniff" of Defendant's vehicle.  While the canine was doing so, Corporal Timberlake asked Defendant if he could search his vehicle.  Defendant denied this request.

The canine then alerted to the presence of narcotics at which point Corporal Timberlake informed Defendant that he was going to search both his vehicle and his person and asked him if there was "anything illegal in the car[.]"  Defendant told Corporal Timberlake that he had a .25-caliber Titan handgun in his back right pants pocket, which Corporal Timberlake secured. Corporal Timberlake then placed Defendant under arrest for carrying a concealed gun.

Upon searching Defendant's vehicle, Corporal Timberlake discovered and seized two clear bags containing a white powder — later identified as cocaine — wedged between the driver's seat and the center console.  Corporal Timberlake also discovered a "single bud of marijuana" and a prescription pill bottle containing 13

unknown pills as well as several "bindles"[2] of a substance later identified as heroin under the front passenger seat.

Approximately three months later[3], on 12 September 2012, Detective Matt Ridings ("Detective Ridings") with the Kernersville Police Department's Vice Narcotics Unit was ordered by his supervising officer, Detective Blair Osborne ("Detective Osborne"), to meet with a confidential informant who would introduce him to an individual known as "Mike" who, in turn, would sell heroin to Detective Ridings. The sale was scheduled to take place at 9:00 p.m. that evening at a prearranged location in Kernersville.

Detective Ridings and the informant drove in Detective Ridings' Dodge Durango to the meeting place. After parking and waiting for several minutes, Defendant arrived by himself in the same silver Pontiac Vibe that he had been driving during the 15 June 2012 incident in Winston-Salem. Defendant got out of the vehicle and approached the passenger side of the Durango. The informant introduced Defendant and Detective Ridings to each other, identifying Defendant as "Mike." After a brief conversation, Defendant gave Detective Ridings a plastic bag containing

---

[2] Corporal Timberlake explained that "[a] bindle is a small piece of paper that's folded up, and it's a common thing for where -- how heroin is stored. If you're familiar with, like, a BC powder, like that, you know how they're folded up in that -- it's the same nature, but they're called bindles, and that's how heroin is commonly packaged."

[3] The details surrounding Defendant's release after his arrest on 15 June 2012 are unclear from the record. It appears, however, that he was released on bond.

five bindles of individually packaged doses of heroin in exchange for $120.00. Detective Ridings was wearing a recording device that recorded the entire transaction. Defendant was not arrested at that time in accordance with the plan governing the undercover operation.

The following day, Defendant called Detective Ridings and informed him that he had more heroin to sell. On 19 September 2012, Detective Ridings called Defendant and arranged to purchase more heroin from him. Detective Ridings then traveled to a previously arranged location in Kernersville and waited for Defendant to arrive. After waiting approximately seven minutes, Defendant arrived in the same silver Pontiac Vibe. On this occasion, a younger male later identified as Justin Washington ("Washington"), was riding in the passenger seat of Defendant's vehicle.

Defendant exited his vehicle and approached the passenger side of Detective Ridings' Durango. Defendant then sold Detective Ridings 11 white envelopes held together by rubber bands — several containing heroin and several containing a mixture of heroin and morphine — in exchange for $230.00. Once again, the entire transaction was captured on a recording device worn by Detective Ridings.

Defendant got back into his vehicle and began driving away from the parking lot. Detective Osborne, who was nearby in an unmarked vehicle, began following Defendant's Pontiac Vibe. Detective Osborne radioed a marked patrol vehicle and issued a directive that Defendant's vehicle be stopped. Defendant was pulled over on

South Main Street, approximately two blocks away from the site of his meeting with Detective Ridings. Defendant was arrested for sale of a controlled substance. Washington was detained and searched, but because no narcotics were found on his person he was released. Upon a subsequent search of Defendant's vehicle, law enforcement officers recovered 40 "dosage units" of hydrocodone in the center console.

On 18 November 2013, Defendant was indicted in connection with the 15 June 2012 incident on charges of (1) possession with intent to sell and deliver cocaine (12 CRS 55869); (2) possession with intent to sell and deliver heroin (12 CRS 55869); (3) possession of marijuana up to one half of an ounce (12 CRS 55869); (4) possession of a firearm by a felon (12 CRS 55870); (5) driving with a revoked license (12 CRS 55871); (6) carrying a concealed gun (12 CRS 55871); and (7) maintaining a vehicle for the purpose of selling a controlled substance (12 CRS 55871).

That same day, Defendant was also indicted in connection with the 12 September 2012 incident on charges of (1) selling heroin (12 CRS 59535); (2) delivering heroin (12 CRS 59535); and (3) possession with intent to sell and deliver heroin (12 CRS 59536). Defendant was also simultaneously indicted on charges stemming from the 19 September 2012 incident for (1) selling heroin (12 CRS 59537); (2) delivering heroin (12 CRS 59537); (3) possession with intent to sell and deliver heroin (12 CRS 59537); (4) maintaining a vehicle for the purpose of selling a controlled substance (12 CRS 59538); (5) trafficking in opium or heroin by possession (12 CRS

59359); (6) trafficking in opium or heroin by transportation (12 CRS 59359); and (7) obtaining the status of an habitual felon. The State moved to join all of these offenses, and the trial court granted the State's motion.

A jury trial was held on 24 February 2014 in Forsyth County Superior Court before the Honorable Edwin G. Wilson. Prior to trial, Defendant filed a motion to suppress the evidence seized during the 15 June 2012 traffic stop. The trial court denied Defendant's motion before trial, and Defendant then pled guilty to the offenses arising from the 15 June 2012 incident, reserving the right to appeal the denial of his motion to suppress. Defendant was then tried on the remaining charges.

At the close of all of the evidence, the trial court dismissed the charge of maintaining a vehicle for the purpose of selling a controlled substance as well as the habitual felon charge. The jury found Defendant guilty of all remaining charges. The trial court consolidated the convictions, and Defendant was sentenced to 90-117 months imprisonment. Defendant gave oral notice of appeal in open court.

**Analysis**

**I. Denial of Motion to Suppress**

Defendant's first argument is that the trial court erred in denying his motion to suppress the evidence seized during the 15 June 2012 traffic stop. Specifically, Defendant asserts that because law enforcement officers did not possess the requisite reasonable suspicion necessary to initiate the traffic stop, any evidence seized as a

result of the subsequent search of his vehicle constituted "fruit of the poisonous tree." We agree.

"When a motion to suppress is denied, this Court employs a two-part standard of review on appeal: The standard of review in evaluating the denial of a motion to suppress is whether competent evidence supports the trial court's findings of fact and whether the findings of fact support the conclusions of law." *State v. Jackson*, __ N.C. __, __, 772 S.E.2d 847, 849 (2015) (citation and quotation marks omitted). In the present case, the trial court made only oral findings of fact and conclusions of law in denying Defendant's motion to suppress, which stated, in pertinent part, as follows:

> THE COURT: All right. Thank you. I'm going to deny the motion to suppress, make the following findings -- it seems to me this is just, basically, good detective work.
>
> . . . .
>
> [Detective Williams] knew that Shae Collins was out of prison, and she had information, she had a tip that he was conducting business again at the Combs Barber Shop. Shae Collins was, in fact, the target.
>
> . . . .
>
> About 9:49, a white Buick arrived, and a person entered the business. There had been a person in a Lexus who entered at the same time as the person who was in the Buick. This Lexus had also been parked there.
>
> . . . .
>
> About 10:59, a Buick [sic] Vibe arrives, which the defendant was driving. Shae, at this time, was in the salon.

The detective, from her training and experience at this time, had the feeling that what was going on was a narcotics transaction. Two people left and went to the corner. These were the two people other than Shae and the defendant.

Shae locked the barber shop. Shae and the defendant went in the hair salon. Shae then went to the corner and met the two people who had been in the Buick and the Lexus. The conversation ensued.

The defendant then exited the hair salon, came to the corner where the four people talked. At that point, the defendant left in the Buick [sic].

Aware that this seemed to have all the makings of a drug transaction, the detective called for surveillance on the Buick [sic].

. . . .

Detective Santiago is called. . . . He followed the defendant[.]

. . . .

The defendant went on to Waughtown Street, took a sharp turn into a moped area, and Santiago began to notice that the defendant was conducting what's called counter-surveillance technically. The defendant went onto 52 North and began using the cloverleafs in a suspicious manner. . . . He told Detective Williams this, and conveyed this suspicious driving to Detective Williams, asked for a marked car to stop the defendant.

. . . .

Looking at the totality of the circumstances, the training of these officers, the behavior indicative of drug dealing, the previous association with the defendant and

with Shae Collins, as well as the counter-surveillance and the suspicious driving, there is reasonable articulable suspicion for the stop.

It is well established that

> [t]he Fourth Amendment protects the right of the people against unreasonable searches and seizures. It is applicable to the states through the Due Process Clause of the Fourteenth Amendment. It applies to seizures of the person, including brief investigatory detentions such as those involved in the stopping of a vehicle.
>
> Only unreasonable investigatory stops are unconstitutional. An investigatory stop must be justified by a reasonable suspicion, based on objective facts, that the individual is involved in criminal activity.
>
> A court must consider the totality of the circumstances — the whole picture in determining whether a reasonable suspicion to make an investigatory stop exists. The stop must be based on specific and articulable facts, as well as the rational inferences from those facts, as viewed through the eyes of a reasonable, cautious officer, guided by his experience and training. The only requirement is a minimal level of objective justification, something more than an unparticularized suspicion or hunch.

*State v. Watkins*, 337 N.C. 437, 441-42, 446 S.E.2d 67, 69-70 (1994) (internal citations, quotation marks, and ellipses omitted).

When determining whether a law enforcement officer's stop of an individual was reasonable, "the requisite degree of suspicion must be high enough to assure that [the] individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field." *State v. Murray,*

192 N.C. App. 684, 687, 666 S.E.2d 205, 208 (2008) (citation and quotation marks omitted). If reasonable suspicion is found to be lacking, "[u]nder the 'fruit of the poisonous tree' doctrine, evidence must be suppressed if it was obtained as the result of illegal police conduct or was the 'fruit' of that unlawful conduct." *State v. Graves*, 135 N.C. App. 216, 221, 519 S.E.2d 770, 773 (1999).

In analyzing Defendant's argument on this issue, we find our decision in *State v. Harwood*, 221 N.C. App. 451, 727 S.E.2d 891 (2012), instructive. In *Harwood*, a deputy sheriff received an anonymous tip that the defendant would be selling marijuana to an unidentified individual at a certain convenience store later that day and that he would be driving a white vehicle. *Id.* at 452, 727 S.E.2d at 894. The deputy, accompanied by another deputy, drove to the convenience store in an unmarked vehicle. As they pulled into the convenience store parking lot, they saw a white vehicle begin to back out of a parking space. As the white vehicle backed out, they identified the defendant as the driver and began following the vehicle. *Id.* at 452-53, 727 S.E.2d at 894. After traveling a short distance, the deputies observed the defendant's vehicle accelerate and then turn off the highway onto a secondary road and into a housing development. *Id.* at 453, 727 S.E.2d at 894. The defendant proceeded to park his vehicle in the driveway of a residence that was not his registered address. *Id.*

The deputies pulled into the driveway behind the defendant's vehicle, exited their vehicle with weapons drawn, identified themselves, and ordered the defendant and his passenger to exit the vehicle. A deputy approached the defendant, placed him on the ground and handcuffed him. *Id.* at 453, 727 S.E.2d at 894-95. One of the deputies told the defendant about the anonymous tip that he had received, and the defendant admitted that he had traveled to the convenience store for the purpose of selling marijuana. The deputy then asked if the defendant had any more marijuana and if he would be "'willing to let [the deputies] go back to his residence and look'" for marijuana, and the defendant agreed. *Id.* at 453, 727 S.E.2d at 895. The deputies subsequently discovered at his residence a loaded rifle as well as two ammunition canisters containing various quantities of marijuana, cocaine, and pills. *Id.* At trial, the defendant moved to suppress the evidence found at his residence on the ground that the initial stop of his vehicle was not based on reasonable suspicion. *Id.* at 454, 727 S.E.2d at 895. The trial court denied the motion, and the defendant appealed. *Id.*

In viewing the totality of the circumstances surrounding the vehicle stop, we noted that "[w]here the justification for a warrantless stop is information provided by an anonymous informant, a reviewing court must assess whether the tip at issue possessed sufficient indicia of reliability to support the police intrusion on a detainee's constitutional rights." *Id.* at 459, 727 S.E.2d at 898 (citation and quotation marks

- 14 -

omitted). We stated that "[t]he reasonable suspicion at issue in an anonymous tip situation requires that the tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person. The type of detail provided in the tip and corroborated by the officers is critical in determining whether the tip can supply the reasonable suspicion necessary for the stop. Where the detail contained in the tip merely concerns identifying characteristics, an officer's confirmation of these details will not legitimize the tip." *Id.* at 459-60, 727 S.E.2d at 899 (internal citations, quotation marks, brackets, and ellipses omitted).

Based on these principles, we held that

> [a]fter analyzing the totality of the circumstances before us in this case, we conclude that the anonymous tip at issue here did not exhibit sufficient indices of reliability. The tip in question simply provided that Defendant would be selling marijuana at a certain location on a certain day and would be driving a white vehicle. The record contains no information about who the caller was, no details about what the caller had seen, and no information even as to where the caller was located. . . . [T]he tip in this case lacked any detail concerning the nature of Defendant's present and planned activities, such as the time at which Defendant would be at the gas station, the type of vehicle that Defendant would be driving, the identity of the person to whom the sale would be made, or the manner in which the sale would be conducted. Put another way, while the tip at issue here included identifying details of a person and car allegedly engaged in illegal activity, it offered few details of the alleged crime, no information regarding the informant's basis of knowledge, and scant information to predict the future behavior of the alleged perpetrator. As a result, since nothing inherent in the tip itself provided investigating officers with the reasonable articulable

- 15 -

suspicion required to justify detaining Defendant, the only way that Defendant's detention could be upheld would be in the event that the tip contained sufficient details, corroborated by the investigating officers, to warrant a reasonable belief that Defendant was engaging in criminal activity.

*Id.* at 460-61, 727 S.E.2d at 899 (internal citations, quotation marks, brackets, and ellipses omitted).

We therefore concluded that

[n]othing in the subsequent activities of the investigating officers "buttressed" the tip through "sufficient police corroboration." The information obtained by or known to [the sheriff's deputy] prior to observing Defendant at the convenience store did not provide any additional particularized justification for detaining him. . . . The observations made by the investigating officers at the convenience store consisted of nothing more than identifying a "determinate person" at a determinate location, a degree of corroboration that does not suffice to justify an investigative detention. Although [the sheriff's deputy] watched Defendant drive away from the convenience store and ultimately pull his vehicle into the driveway of a residence with an address that differed from his own, Defendant could just as easily have been visiting an acquaintance, giving Mr. White a ride home, or turning around as opposed to engaging in evasive or unlawful conduct. Thus, the information provided and known to [the sheriff's deputy] prior to the seizure did not contain the range of details required . . . to sufficiently predict Defendant's specific future action; it was peppered with uncertainties and generalities. Therefore, given the limited details contained in the tip, and the failure of the officers to corroborate the tip's allegations of illegal activity, the tip lacked sufficient indicia of reliability to justify the warrantless stop in this case. As a result, the investigating officers lacked the reasonable articulable

suspicion necessary to support their decision to detain Defendant.

*Id.* at 461-62, 727 S.E.2d at 899-900 (internal citations, quotation marks, brackets, and ellipses omitted).

We believe the same result is required here. Detective Williams received an anonymous uncorroborated tip approximately one to three months earlier that *Collins* — not Defendant — was selling drugs out of the Shop. This tip did not contain any identifying characteristics of Defendant or predict any present or future illegal activity on his part.

Moreover, during her surveillance of the Shop, Detective Williams merely observed Defendant (1) park in front of the Shop; (2) get out of his vehicle and enter the hair salon adjacent to the Shop; (3) exit the hair salon shortly thereafter; (4) speak with Collins and two unidentified individuals on the corner outside the Shop; and (5) return to his car and drive away.

At no time did Detective Williams see any transaction take place or observe Defendant exchange anything with Collins or the other two individuals at the Shop. Nor did she hear any of the conversations that Defendant had with these individuals.

Detective Williams testified on cross-examination as follows:

> Q. Okay. So between 9:00 p.m. and 10:59 p.m. before [Defendant] got [to the Shop], did you see any crimes occur?
>
> A. Just *speculation* of what occurred with the people coming and going.

Q. Did -- prior to [Defendant] getting there, did you see anyone handling or carrying money or handling or carrying drugs?

A. No, sir.

Q. Or handling or carrying a firearm?

A. No, sir.

Q. All right. When [Defendant] got there, did you see him commit any crimes?

A. I didn't see him do anything but meet with the subjects.

. . . .

Q. Did you see [Defendant] exchange anything with anyone before he left your location?

A. No, sir.

Q. Did you see him carrying anything in his hands or in a bag before he left your location?

A. No, sir, I did not.

Q. Did he ever have anything in his hands?

A. No, sir.

Q. Did he take anything from his car into the barber shop?

A. No, sir, not that I could see in his hands.

(Emphasis added.)

As discussed above, when a law enforcement officer is acting on an anonymous tip, the "officer must have something more than an unparticularized suspicion or hunch before stopping a vehicle." *State v. McArn*, 159 N.C. App. 209, 213, 582 S.E.2d 371, 374 (2003). In *McArn*, an anonymous caller reported to the Lumberton Police Department that a white Nissan vehicle on Franklin and Sessoms Street was involved in the sale of illegal drugs. *Id.* at 210, 582 S.E.2d at 373. An officer proceeded to the area and observed a white Nissan vehicle. *Id.* The officer stopped the vehicle, which was operated by the defendant and also occupied by a passenger and the defendant's children. *Id.* The officer then searched the vehicle and discovered no illegal drugs but upon searching the defendant discovered a "packet of cocaine" in his mouth. *Id.* at 210-11, 582 S.E.2d at 373. The defendant was arrested and indicted for possession of a controlled substance. *Id.* at 211, 582 S.E.2d at 373.

At trial, the defendant moved to suppress the cocaine. *Id.* Upon the trial court's denial of the motion, he pled guilty to the possession charge, reserving his right to appeal the denial of his motion. *Id.* On appeal, we held that the officer who stopped the defendant's vehicle "had no reason to suspect the vehicle's driver or occupants of illegal conduct apart from the anonymous tip." *Id.* at 210, 582 S.E.2d at 373. We explained that

> the tipster never identified or in any way described an
> individual. Therefore, the tip upon which [the officer]
> relied did not possess the indicia of reliability necessary to
> provide reasonable suspicion to make an investigatory

> stop.   The anonymous tipster in no way predicted defendant's actions.   The police were thus unable to test the tipster's knowledge or credibility.  Moreover, the tipster failed to explain on what basis he knew about the white Nissan vehicle and related drug activity.

*Id.* at 214, 582 S.E.2d at 375.

Based on these facts, we reversed the trial court's denial of the defendant's motion to suppress, holding that "the conclusion of the trial court, that the tip created a sufficient reasonable suspicion to justify stopping defendant's vehicle, was error." *Id.*  This reasoning applies equally here.

Nor did a reasonable suspicion sufficient to warrant stopping Defendant's vehicle arise based on Defendant's conduct after leaving the Shop.  Upon following Defendant's vehicle, Detective Santiago did not observe Defendant commit any illegal actions or motor vehicle infractions.  Rather, he merely observed Defendant legally turn into a business parking lot and subsequently drive around the "cloverleaf" exit ramps of an interchange.  Based upon Detective Santiago's report of this information to Detective Williams, Detective Williams then ordered Corporal Timberlake — who also did not observe Defendant commit any traffic violations — to initiate a stop of Defendant's vehicle.

Such lawful conduct did not give rise to reasonable suspicion sufficient to justify the stop of Defendant's vehicle.  *See Harwood*, 221 N.C. App. at 462, 727 S.E.2d at 900 (finding that despite defendant's actions in turning onto secondary road and

- 20 -

parking in driveway of house that was not his own after leaving site of alleged drug sale referenced in anonymous tip did not give rise to reasonable suspicion supporting stop of defendant's vehicle).

Consequently, we hold that the trial court's findings of fact do not support its legal conclusion that reasonable suspicion existed to stop Defendant's vehicle. We therefore reverse the trial court's order denying Defendant's motion to suppress and vacate Defendant's convictions stemming from his guilty plea to the offenses arising from the 15 June incident. *See State v. Jackson*, 199 N.C. App. 236, 244, 681 S.E.2d 492, 498 (2009) ("In this case, the cocaine and weapon found in the car were discovered as a direct result of the illegal search and, therefore, should have been suppressed as fruit of the poisonous tree. . . . The trial court's order denying Defendant's motion to suppress is REVERSED and its judgment is VACATED.").

## II. Rule 404(b) Evidence

Defendant's final argument on appeal is that the trial court erred in allowing the State to introduce under Rule 404(b) evidence regarding the 15 June 2012 incident at his trial on the charges stemming from the 12 September and 19 September incidents. Specifically, he contends that this evidence was inadmissible and that its admission constituted prejudicial error.

We conclude that Defendant has failed to establish that any such error was sufficiently prejudicial to warrant the vacating of his charges stemming from the 12

September and 19 September incidents. *See State v. Williams*, 156 N.C. App. 661, 665, 577 S.E.2d 143, 146 (2003) (applying prejudicial error analysis upon determination that Rule 404(b) evidence of past drug transaction was erroneously admitted). "A defendant is prejudiced by errors when there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises." *State v. Carpenter*, 361 N.C. 382, 392, 646 S.E.2d 105, 112 (2007) (citation, quotation marks, and ellipses omitted). Moreover, "[t]he party who asserts that evidence was improperly admitted usually has the burden to show the error and that he was prejudiced by its admission." *State v. LePage*, 204 N.C. App. 37, 43, 693 S.E.2d 157, 162 (2010) (citation and quotation marks omitted).

Because of the clear evidence of Defendant's guilt of the charges stemming from the sale of drugs by him to Detective Ridings on 12 September and 19 September, Defendant cannot show prejudice resulting from the admission of the evidence as to the 15 June incident. Defendant was identified by a confidential informant as being in the business of selling heroin. While working undercover, Detective Ridings purchased heroin from Defendant on two separate occasions. Both of these transactions were recorded by a recording device worn by Detective Ridings. These recordings were entered into evidence at trial. Thus, the evidence of

Defendant's guilt of the offenses stemming from his sale of drugs to Detective Ridings on 12 September and again on 19 September was overwhelming.

We likewise reject Defendant's argument that because Washington was a passenger in the Pontiac Vibe on 19 September, the improper admission of the evidence regarding the 15 June incident could have prejudiced the jury into simply assuming that the hydrocodone found in the Pontiac Vibe on 19 September belonged to Defendant — rather than Washington. "Possession of . . . drugs need not be exclusive. It is well established in North Carolina that possession of a controlled substance may be either actual or constructive." *State v. Jenkins*, 167 N.C. App. 696, 700, 606 S.E.2d 430, 433 (internal citations and quotation marks omitted), *aff'd per curiam,* 359 N.C. 423, 611 S.E.2d 833 (2005). We have held that "[a] person has actual possession of a substance if it is on his person, he is aware of its presence, and either by himself or together with others he has the power and intent to control its disposition or use." *State v. Johnson*, 203 N.C. App. 718, 724, 693 S.E.2d 145, 148 (2010) (citation and quotation marks omitted). "A defendant constructively possesses contraband when he or she has the intent and capability to maintain control and dominion over it." *State v. Miller*, 363 N.C. 96, 99, 678 S.E.2d 592, 594 (2009) (citation and quotation marks omitted). Furthermore, our Supreme Court has recognized that

> actual and constructive possession often so shade into one another that it is difficult to say where one ends and the other begins. This ambiguity is likely attributable to the fact that both actual and constructive possession will

support a finding of "possession" within the meaning of our statutes, making it unnecessary to distinguish between the two in many instances. Nonetheless, it is important analytically to appreciate that actual possession may be proven by circumstantial evidence[.]

*State v. McNeil*, 359 N.C. 800, 813, 617 S.E.2d 271, 279 (2005) (internal citations and quotation marks omitted).

In the present case, we believe abundant evidence existed for the jury to conclude that Defendant had actual possession of the hydrocodone found in the center console of his vehicle on 19 September. The Pontiac Vibe was clearly under his control as he had previously driven the same vehicle — alone — to the 12 September meeting with Detective Ridings. The hydrocodone was found during a search of the Pontiac Vibe on 19 September immediately after Defendant had sold the 11 envelopes containing a mixture of heroin and morphine to Detective Ridings. The hydrocodone was in the center console of the vehicle, which was within the reach of Defendant who was in the driver's seat. Thus, the State demonstrated that Defendant had the "power and intent" to control the hydrocodone's disposition or use.

Moreover, at a minimum, he had constructive possession of the hydrocodone. We have held that

> [a] person is said to have constructive possession when he, without actual physical possession of a controlled substance, has both the intent and the capability to maintain dominion and control over it.
>
> As the terms "intent" and "capability" suggest, constructive

possession depends on the totality of circumstances in each case. No single factor controls, but ordinarily the question will be for the jury. The fact that a person is present in a vehicle where drugs are located, nothing else appearing, does not mean that person has constructive possession of the drugs. There must be evidence of other incriminating circumstances to support constructive possession.

*Jenkins*, 167 N.C. App. at 700, 606 S.E.2d at 433 (internal citations, quotation marks, brackets, ellipses, and emphasis omitted).

In determining whether "other incriminating circumstances" exist in this context, our Supreme Court has held that "[o]ur cases addressing constructive possession have tended to turn on the specific facts presented. . . . [T]wo factors frequently considered are the defendant's proximity to the contraband and indicia of the defendant's control over the place where the contraband is found." *Miller*, 363 N.C. at 99-100, 678 S.E.2d at 594-95.

For example, in *State v. Matias*, 354 N.C. 549, 556 S.E.2d 269 (2001), the defendant was a passenger in a vehicle stopped in a parking lot by law enforcement officers after they detected the odor of marijuana emanating from it. *Id.* at 550-51, 556 S.E.2d at 270. After ordering the occupants of the vehicle to leave the car, the officers searched it and found various types of drugs. *Id.* at 551, 556 S.E.2d at 270. On appeal, this Court held that there was sufficient evidence of "other incriminating circumstances" — namely, the fact that marijuana was being smoked in the vehicle — to support the charge of possession and affirmed the defendant's conviction despite

the defendant not having exclusive control of the subject vehicle. *Id.* at 552-53, 556 S.E.2d at 271; *see also McNeil*, 359 N.C. at 813, 617 S.E.2d at 279 (finding constructive possession of cocaine by defendant despite his lack of exclusive control over area where drugs were discovered).

Here, the State presented evidence that (1) Defendant drove the Pontiac Vibe to a prearranged site where he proceeded to sell heroin and morphine to Detective Ridings and then immediately left the scene in that vehicle; and (2) hydrocodone was discovered shortly thereafter by law enforcement officers upon their search of the vehicle. This evidence easily qualifies as "other incriminating circumstances" sufficient to establish constructive possession despite the fact that Defendant was not alone in the vehicle, and, as a result, Defendant cannot show prejudice from the admission of evidence regarding the 15 June incident.

For these reasons, Defendant's argument on this issue is without merit. However, because (1) the trial court consolidated all of Defendant's convictions for sentencing purposes; and (2) we are vacating his convictions for the offenses stemming from his 15 June 2012 charges, we must remand for resentencing by the trial court. *See State v. Hardy*, __ N.C. App. __, __, 774 S.E.2d 410, 420 (2015) ("When the trial court consolidates multiple convictions into a single judgment but one of the convictions was entered in error, the proper remedy is to remand for resentencing when the appellate courts are unable to determine what weight, if any, the trial court

gave each of the separate convictions in calculating the sentences imposed upon the defendant." (citation, quotation marks, and ellipses omitted)).

## Conclusion

For the reasons stated above, we reverse the denial of Defendant's motion to suppress and vacate the trial court's judgment as to the following charges to which Defendant pled guilty: (1) possession with intent to sell or deliver cocaine (12 CRS 55869); (2) possession with intent to sell or deliver heroin (12 CRS 55869); (3) possession of marijuana up to one half of an ounce (12 CRS 55869); (4) possession of a firearm by a felon (12 CRS 55870); (5) driving with a revoked license (12 CRS 55871); (6) carrying a concealed gun (12 CRS 55870); and (7) maintaining a vehicle for the purpose of selling a controlled substance (12 CRS 55870)[4]. We find no prejudicial error as to Defendant's remaining convictions. Finally, we remand for resentencing.

REVERSED IN PART; VACATED IN PART; NO PREJUDICIAL ERROR IN PART; REMANDED FOR RESENTENCING.

Judges BRYANT and INMAN concur.

Report per Rule 30(e).

---

[4] The charges of carrying a concealed gun and maintaining a vehicle for the purpose of selling a controlled substance are listed in the indictment under case number 12 CRS 5587*1*. However, they are numbered 12 CRS 5587*0* in Defendant's plea agreement and the trial court's judgment. Therefore, in order to avoid any possible confusion, we wish to make clear that we are vacating both the carrying a concealed gun conviction and the maintaining a vehicle for the purpose of selling a controlled substance conviction.